See Dissenting Opinion

Filed 1/24/24  In re E.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re E.M. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E081259 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ2100120) |
| v. | OPINION |
| N.F. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Michael J. Rushton, Judge.  Conditionally affirmed and remanded with directions.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and Appellant N.F.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant E.M.

Minh C. Tran, County Counsel, Teresa K.B. Beecham, and Catherine E. Rupp, for Plaintiff and Respondent. Conditionally affirmed and remanded with directions.

A mother and father appeal from orders terminating their parental rights over two children. In their view, the juvenile court erred by not ordering posttermination sibling visitation with an older half-sibling, who was a party to the dependency proceedings but is not a party in this appeal. The parents also argue the county welfare department did not comply with California law implementing the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) because it failed to ask several available extended family members whether the children have any Indian ancestry.[1] We reject the first argument, but agree with the second, so we conditionally affirm and remand with directions.

BACKGROUND

In November 2020, one of the children (born in September 2018) was living with father in Los Angeles County, while the other (born July 2020) and the half-sibling (born May 2005) lived with mother in Riverside. The half-sibling's father's whereabouts were unknown. In the same month, the Los Angeles county welfare agency filed a dependency petition, alleging all three children came within Welfare and Institutions Code[2] section 300, subdivision (a) (serious physical harm) and (b)(1) (failure to protect). At the

---

[1] "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*).)

[2] Undesignated statutory references are to the Welfare and Institutions Code.

2

detention hearing, the court detained all three children from their fathers and released them to mother, ordering family maintenance services for mother.

In January 2021, the juvenile court took jurisdiction over the three children. The court removed them from "both of their respective fathers" and placed them with mother. The court ordered reunification services for father and family maintenance services for mother.

The matter was transferred to Riverside County in March 2021. At the July 2021 six-month status review hearing, the juvenile court detained all three children from mother. In September 2021, the court sustained allegations of a supplemental dependency petition under section 387 filed as to mother. It removed all three children from mother and ordered that she receive reunification services, and terminated father's reunification services.

When the three children were initially removed from mother's care, they were placed together, with father's sister (thus, the paternal aunt of the two younger children). By September 2021, they were no longer placed with any relative, and were not placed together. The court found that the children and their half-sibling comprised a sibling group, that "[d]eveloping or maintaining the sibling relationship with the siblings is appropriate," and that the siblings' relationships had been maintained per section 16002.

The half-sibling visited separately with the youngest child once at the end of September 2021, and then with the other child a few days later, at the beginning of October 2021. Both younger children cried at the end of those visits, which upset the

3

half-sibling, who expressed "he would rather not have any visits with [the children] anymore after that."

At the six-month status review hearing as to mother in April 2022, the court terminated her services and set a section 366.26 hearing. The section 366.26 hearing was initially set for all three children, but later vacated as to the half-sibling.[3]

In July 2022, the two younger children were placed together in a foster home with caregivers who were interested in adopting them. At around the same time, the half-sibling indicated "he would possibly be interested in visiting [with the younger children] after they [were] stable in their adoptive home." They had an initial video chat visit, and then a visit in a park, in November 2022. The half-sibling "said that he enjoyed the visit" and that he would tell his caretaker when he is ready for another. He later said that "he wishes to have visitation with his siblings," but he was unsure how often, because the "visits are emotional for him and his siblings."

At the contested section 366.26 hearing in April 2023, the two younger children's counsel agreed with DPSS's recommendation to terminate parental rights, and argued no exception to termination applied. As to the sibling relationship exception, counsel noted she had spoken with the caregivers' attorney, who advised her that they were "planning to continue that sibling relationship." Counsel did not believe the children's relationship

_____

[3] In February 2023, the juvenile court ordered "Another Planned Permanent Living Arrangement" for the half-sibling with a "Transitional Independent Living Case Plan." The half-sibling turned 18 years old in May 2023.

4

with their half-sibling outweighed their "needs for permanency, which they have with these caregivers." Mother and father did not argue otherwise.

Through counsel, the half-sibling expressed that he did not object to the termination of parental rights, and believed "the current caretakers are providing excellent care for his siblings." He wanted to continue the sibling visits.

The juvenile court found the two younger children likely to be adopted and terminated the parental rights of mother and father.

DISCUSSION

A. *Sibling Visitation*

The parents argue the juvenile court erred by not ordering sibling visitation between the children and their older half-sibling. We reject the argument for three reasons.

First, the argument is forfeited. At the section 366.26 hearing, neither parent asked the court to consider an order concerning sibling visitation (and neither argued that the sibling bond exception (§ 366.26, subd. (c)(1)(B)(v)) applied). (See *In re Anthony P.* (1995) 39 Cal.App.4th 635, 641 ["Appellant has waived her right to assert error as to sibling visitation on appeal by not properly raising the issue below"].)

Second, parents lack standing to raise the issue. To have standing to appeal a lower court's decision, a party must be aggrieved by that decision, meaning the party's "rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision." (*In re*

5

*K.C.* (2011) 52 Cal.4th 231, 236.)  Especially after termination, when the sibling bond exception is no longer a potential issue, the "minor's interest in maintaining a relationship with siblings is unrelated to the parents' interest in reunification."  (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 809; accord *In re K.C.*, *supra*, 52 Cal.4th at p. 238 [parents lack standing to challenge posttermination placement in appeal from order terminating parental rights unless "the placement order's reversal advances the parent's argument against terminating parental rights"].)  The only interest the parents argue is at stake in the court's decision not to order posttermination sibling visitation is the loss to the children of "their treasured sibling relationship."  They do not articulate any specific way their own rights or interests are injuriously affected.

The parents attempt to show they have standing to raise the sibling visitation issue by analogy to ICWA case law.  We are not persuaded.  They argue, relying primarily on *In re Jonathon S.* (2005) 129 Cal.App.4th 334, 339 (*Jonathon S.*), that "it is well established that a non-Indian parent has standing to assert an ICWA notice violation on appeal even though this issue is not related to the parents' rights and therefore the parents are not aggrieved."[4]  This argument misconstrues *Jonathon S.*, which held a non-Indian parent has standing to appeal precisely *because* ICWA confers rights to "[e]ven a non-Indian parent," so an ICWA notice violation injuriously affects the non-Indian parent's

_____

[4] The other cases parents cite—*In re A.W.* (2019) 38 Cal.App.5th 655, 663 and *In re B.R.* (2009) 176 Cal.App.4th 773, 779-780—apply *Jonathon S.*'s holding without any additional analysis.

6

rights. (*Jonathon S.*, at p. 339.) Thus, *Jonathon S.* does not support parents' claim of standing regarding posttermination sibling visitation.

Third, assuming for the sake of argument the issue of posttermination sibling visitation was not forfeited and parents had standing to raise it here, and assuming also the trial court erred, parents' challenge to the juvenile court's decision still fails because they do not explain how they were prejudiced by the alleged error. (*In re J.P.* (2017) 15 Cal.App.5th 789, 798 [harmless error analysis applies in dependency proceedings].) (Although analytically separate, this failure is symptomatic of the parents' lack of any interest or right that is injuriously affected by the claimed error. Viewed in that light, it tends to support our conclusion they lack standing to raise the issue.)

For each of these reasons, we reject the parents' argument about posttermination sibling visitation.

B. *ICWA*

Mother and father both have repeatedly denied any Indian ancestry. Yet extended relatives on both sides were also apparently available for inquiry, including a paternal aunt, a maternal aunt, a maternal uncle, and both grandmothers. There is nothing in the record showing, however, that any extended relatives were asked whether the children may have Indian ancestry. Relying on *In re Robert F.* (2023) 90 Cal.App.5th 492, review granted July 26, 2023, S279743 (*Robert F.*) and *In re Ja.O.* (2023) 91 Cal.App.5th 672, 680-681, review granted July 26, 2023, S280572 (*Ja.O.*), the department argues it had no duty to include extended relatives in its ICWA initial inquiry. The department's

conclusion follows from those cases' reasoning. We are not persuaded, however, that the reasoning of those cases is correct.

ICWA establishes minimum national standards "for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." (25 U.S.C. § 1902.) Under California law, the juvenile court and county child welfare department have "an affirmative and continuing duty to inquire" whether a child subject to a section 300 petition may be an Indian child. (§ 224.2, subd. (a); see *In re D.F.* (2020) 55 Cal.App.5th 558, 566 (*D.F.*).) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*D.F.*, at p. 566.) Only the initial duty is at issue in this appeal.

The initial duty applies in every dependency. (*In re J.S.* (2021) 62 Cal.App.5th 678, 686; see § 224.2, subd. (b).) It "begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) This means that the department has a duty to inquire about Indian heritage even when merely investigating an allegation, or when providing services to maintain a child in their home.

The initial duty expands under subdivision (b) of section 224.2 when a child is removed from their home, because such removal increases the possibility of "involuntary out-of-home placement" of Indian children. (§224, subd. (a)(1).) Under that provision, "'[i]f a child is placed into the temporary custody of a county welfare department

8

pursuant to Section 306,' the department's obligation includes asking the 'extended family members' about the child's Indian status."[5] (*Robert F*., *supra*, 90 Cal.App.5th at p. 497; § 224.2, subd. (b).) The Legislature added this language through Assembly Bill No. 3176 (2017-2018 Reg. Sess.), which made ICWA-related changes to the Welfare and Institutions Code, effective January 1, 2019. (Stats. 2018, ch. 833, § 5.) The Judicial Council revised rule 5.481 of the California Rules of Court to implement section 224.2, subdivision (b) by requiring inquiry of extended family in every case in which the department seeks to place the child: "The party seeking a foster-care placement, . . . termination of parental rights, preadoptive placement, or adoption must ask the child, if the child is old enough, and the parents, Indian custodian, or legal guardians, *extended family members*, others who have an interest in the child, and where applicable the party reporting child abuse or neglect, whether the child is or may be an Indian child . . . ." (Cal. Rules of Court[6], rule 5.481(a)(1), italics added.)

Opinions from our division disagree on whether that rule of court correctly interprets the statute by requiring the department to inquire of extended family members in every case where a child is removed from home. *Robert F*. held the statute requires the department's inquiry to include extended family members only when the child is

---

[5] Section 224.2, subdivision (b), also applies when a child is placed in the temporary custody of a county probation department under section 307. (See § 224.2, subd. (b).) The Legislature may have intended the section *not* to apply if a county department temporarily assumes custody of a child under section 301 in a voluntary removal that is designed to provide services to maintain the family. (See § 16507.4.)

[6] Undesignated rules references are to the California Rules of Court.

taken into custody without a warrant. *Robert F.* reached that conclusion by following the concurring opinion in *In re Adrian L.* (2022) 86 Cal.App.5th 342, 357-358 (*Adrian L.*) and adopting the *Adrian L.* concurrence's view that "[a] department that takes a child into protective custody pursuant to a warrant does so under section 340, not section 306." (*Robert F.*, at p. 497.) Later, *In re Ja.O.* (2023) 91 Cal.App.5th 672, 677-678, review granted July 26, 2023, S280572 (*Ja.O.*) adopted that reading of section 224.2, subdivision (b). Yet another opinion then disapproved of rule 5.481 to the extent that it required an extended family inquiry in cases where the child was removed by warrant. (*In re Andres R.* (2023) 94 Cal.App.5th 828, review granted Nov. 15, 2023, S282054 (*Andres R.*).)

Unlike these cases, *In re Delila D.* (2023) 93 Cal.App.5th 953, review granted Nov. 15, 2023, S282054 (*Delila D.*) found *Robert F.*'s statutory interpretation "contrary to both the letter and spirit of Assembly Bill 3176." (*Delila D.*, at p. 962.) *Delila D.* reasoned that because section 306, subdivision (a)(1), grants the department the authority to "'receive' . . . and 'maintain'" temporary custody of a child when "delivered" to a social worker by law enforcement, temporary custody includes children brought to the department after removal by a warrant. (*Delila D.*, at pp. 971-972.) Thus, *Delila D.* held "there is only one duty of initial inquiry, and that duty encompasses available extended family members no matter how the child is initially removed from home." (*Ibid.*) Under *Delila D.*, section 224.2, subdivisions (a) and (b), as well as rule 5.481, social workers have "a duty of initial inquiry that begins at first contact, lasts throughout the proceeding,

10

and includes 'but is not limited to' the reporting party, the child's parents and extended family members, and others who have an interest in the child, as those individuals become available during the case." (*Delila D.*, at p. 966.) Three opinions from other divisions have followed *Delila D.* (See *In re C.L.* (2023) 96 Cal.App.5th 377; *In re Jerry R.* (2023) 95 Cal.App.5th 388; *In re V.C.* (2023) 95 Cal.App.5th 251.)

This conflict in authority is under review by our Supreme Court, with *Ja.O.* as the lead case. We find *Delila D.*'s thoughtful discussion of the statutory language and legislative history persuasive and adopt its reasoning and conclusions. Applying *Delila D.* to this case, the department's initial duty of inquiry included the ongoing duty to inquire of extended family members who became available during the case.

In the alternative, relying on *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, the department proposes we should affirm the juvenile court because the inquiry it conducted was adequate. Certainly, we agree the department needed to make only "reasonable and diligent efforts to conduct the required inquiry and report those efforts and the results thereof to the court." (*In re J.K.* (2022) 83 Cal.App.5th 498, 508, fn. 7.) No one is asserting the department was required to "undergo overly voluminous record searches, attend family reunions, conduct stakeouts, or search Ancestry.com. Nor [is it] required to interview young children or other extended family members who would not be expected to have any information regarding the [children's] Indian status." (*Ibid.*) We are not persuaded, however, that an inquiry may be considered reasonable and diligent when the department fails to inquire of extended relatives who *are* readily available and reasonably

11

might have information about the child's Indian status.  To the extent *Ezequiel G.* holds otherwise, we decline to follow it.

In short, the department did not fulfill its duty of initial inquiry under ICWA because it failed to ask several readily available extended relatives whether the children are or might be Indian children.  The trial court erred by finding ICWA did not apply even though the department had not fulfilled its duty of initial inquiry.  We turn, then, to whether the error should be considered harmless.

There are multiple approaches to assessing harmlessness in the ICWA context, and the issue is currently under review by our Supreme Court. (See *In re Dezi C.* (2022) 79 Cal.App.5th 769, 777-782, review granted Sept. 21, 2022, S275578).) We will apply the approach we described in *Benjamin M.*, *supra*, 70 Cal.App.5th at p. 739.  That is, we will find prejudice when an agency "fail[s] to investigate readily obtainable information tending to shed meaningful light on whether a child is an Indian child." (*Ibid.*)  Even where the agency has erred, however, it may be that, "considering the entire record, it was obvious that additional information would not have been meaningful to the inquiry." (*Id.* at p. 743.)  "This might occur where the evidence already uncovered in the initial inquiry was sufficient for a reliable determination." (*Ibid.*)

At times, a record could demonstrate that the initial inquiry was sufficient for a reliable determination, even though there was an erroneous failure to inquire of some extended relatives.  For example, in theory, the department could have uncovered information affirmatively showing the children were disqualified from tribal membership.

(Cf. *In re J.M.* (2012) 206 Cal.App.4th 375, 382 [tribe's membership criteria showed children disqualified from membership "irrespective of their great-great grandparents' possible membership in the tribe"].)  In some circumstances, a thorough, but not perfect, inquiry can suffice for a reliable determination, despite some omissions.  (See *In re Rylei S.* (2022) 81 Cal.App.5th 309, 325 [discussing hypothetical where agency "interviews the maternal grandfather; several, but not all of his four siblings, and the maternal grandfather's surviving parent, none of whom indicates the family has any Indian ancestry," and concluding that the "failure to interview the grandfather's remaining siblings would certainly be harmless absent some additional unusual circumstance"].)

The record here, however, demonstrates nothing of the sort.  The department only emphasizes that mother and father consistently denied Native American ancestry.  This line of reasoning ignores that a parent or other relative may deny Indian ancestry, but an interview with another available extended family member may nevertheless reveal such ancestry.  (See *In re Y.W.* (2021) 70 Cal.App.5th 542, 554 [to accept parent's denial of any knowledge of Indian ancestry, without further inquiry, "ignores the reality that parents may not know their possible relationship with or connection to an Indian tribe"]; *In re T.G.* (2020) 58 Cal.App.5th 275, 289 ["Oral transmission of relevant information from generation to generation and the vagaries of translating from Indian languages to English combine to create the very real possibility that a parent's or other relative's identification of the family's tribal affiliation [or lack thereof] is not accurate"].)  Here, the department's initial inquiry apparently included no extended family members at all.

13

We reject the notion that a reliable determination of a child's Indian status can or should be made from such a limited inquiry when other relatives are readily available and may have different information.

DISPOSITION

The orders terminating mother's and father's parental rights to the children are conditionally affirmed. We remand to the juvenile court for the department and the court to comply with the inquiry and notice provisions of ICWA and California law consistent with this opinion, including inquiring of extended family members. If the court finds the children are Indian children, it shall conduct a new section 366.26 hearing, as well as all further proceedings, in compliance with ICWA and related California law. If not, the court's original section 366.26 orders will remain in effect.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL＿＿＿＿＿＿＿
J.

I concur:

RAMIREZ＿＿＿＿＿＿＿
P. J.

[*In re E.M.*, E081259]

MENETREZ, J., Dissenting.

I disagree with the majority opinion's analysis and conclusion concerning the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.).[1] I continue to agree with *In re Robert F.* (2023) 90 Cal.App.5th 492, 497 (*Robert F.*), review granted July 26, 2023, S279743, and *In re Ja.O.* (2023) 91 Cal.App.5th 672, 680 (*Ja.O.*), review granted July 26, 2023, S280572, that the expanded duty of initial inquiry under subdivision (b) of Welfare and Institutions Code section 224.2 (section 224.2(b)) applies only if the child was placed into temporary custody without a warrant. (Unlabeled statutory citations refer to the Welfare and Institutions Code.) For the reasons explained in *In re Andres R.* (2023) 94 Cal.App.5th 828, 840-856 (*Andres R.*), review granted November 15, 2023, S282054, I am not persuaded by the criticisms of *Robert F.* that were expressed in *In re Delila D.* (2023) 93 Cal.App.5th 953 (*Delila D.*), review granted September 27, 2023, S281447. (The majority opinion in *Delila D.* never cites *Ja.O.* and does not address its analysis, even though *Delila D.* adopts a statutory interpretation that was discussed and rejected in *Ja.O.*)

Since *Andres R.* was published in August 2023, four published opinions have agreed with *Delila D.* that the duty to inquire of extended family members under section 224.2(b) is not limited to cases in which the children were placed into temporary custody

---

[1]   "[B]ecause ICWA uses the term 'Indian,' [I] do the same for consistency, even though [I] recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

without a warrant:  *In re L.B.* (Dec. 28, 2023, A167363) __ Cal.App.5th __ (2023 Cal.App. Lexis 1006) (*L.B.*); *In re C.L.* (2023) 96 Cal.App.5th 377 (*C.L.*); *In re Jerry R.* (2023) 95 Cal.App.5th 388 (*Jerry R.*); and *In re V.C.* (2023) 95 Cal.App.5th 251 (*V.C.*). Below I identify some of the reasons why I do not find those opinions persuasive.

Those reasons will be easier to explain, however, if I begin with a brief description of the analysis with which I agree.  First, the statutory analysis developed in *Robert F.*, *Ja.O.*, and *Andres R.* can be summarized as follows:  (1) Section 224.2(b) provides that there is a duty to conduct ICWA inquiry of extended family members "[i]f a child is placed into the temporary custody of a county welfare department pursuant to Section 306 or county probation department pursuant to Section 307"; (2) subdivisions (a)(1) and (a)(2) of section 306 describe the only ways a child can be placed into the temporary custody of a county welfare department under section 306; (3) subdivision (a)(1) of section 306 authorizes a social worker to "[r]eceive and maintain" "temporary custody" of a child from a peace officer, and the only way a peace officer can take a child into "temporary custody" is "without a warrant" pursuant to section 305, 305.6, or 625; (4) subdivision (a)(2) of section 306 authorizes a social worker to take a child into "temporary custody" "without a warrant"; (5) the only way a child can be placed into the temporary custody of a county probation department pursuant to section 307 is if the child was taken into temporary custody under section 305, which exclusively concerns warrantless removals; so (6) the extended family inquiry duty under section 224.2(b) is

2

triggered only by warrantless removals.[2]  (See *Andres R.*, *supra*, 94 Cal.App.5th at pp. 841-845; *Ja.O.*, *supra*, 91 Cal.App.5th at pp. 677-678; *Robert F.*, *supra*, 90 Cal.App.5th at pp. 500-501.)

Second, the Legislature's creation of a duty to conduct ICWA inquiry of extended family members when a child is removed without a warrant makes sense because that is what the Bureau of Indian Affairs (BIA) guidelines recommend.  (U.S. Dept. of the Interior, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016) (BIA guidelines) pp. 23-24, 28, available at <https://www.bia.gov/sites/default/files/dup/assets/bia/ois/pdf/idc2-056831.pdf> [as of Jan. 22, 2024] [recommending extended family inquiry in cases of "emergency removal" and defining emergency removal as removal "without court authorization"]; see *Andres R.*, *supra*, 94 Cal.App.5th at pp. 849-851; *Ja.O.*, *supra*, 91 Cal.App.5th at pp. 680-681; *Robert F.*, *supra*, 90 Cal.App.5th at pp. 502-503.)

Third, the BIA guidelines' recommendation and the Legislature's decision to follow it make sense because (among other reasons) the criteria for warrantless removal

---

[2]    *Delila D.* misdescribes the language of subdivision (a)(1) of section 306, asserting that it "authorizes the social worker to 'receive' the child and 'maintain' them in temporary custody." (*Delila D.*, *supra*, 93 Cal.App.5th at p. 971.)  That is not what the statute says.  Rather, it authorizes the social worker to "[r]eceive and maintain . . . temporary custody of a child who is described in Section 300, and who has been delivered by a peace officer." (§ 306, subd. (a)(1).)  Thus, by its terms, the statute authorizes the social worker to receive *temporary custody*.  Consequently, the child must already be in temporary custody before the child is delivered by the peace officer.  *Delila D.* elides the issue by incorrectly asserting that the statute authorizes the social worker to receive *the child*, rather than receiving *temporary custody* of the child.  That point was made in *Andres R.*, *supra*, 94 Cal.App.5th at pp. 842-843, but none of the cases following *Delila D.* mentions it.

3

under both the BIA guidelines and California law include parental absence. (*Andres R.*, *supra*, 94 Cal.App.5th at pp. 852-853; BIA guidelines, at p. 24 [warrantless removal is permitted "when a young child is left without care or adequate supervision"]; § 305, subd. (a) [warrantless removal is authorized if "the fact that the child is left unattended poses an immediate threat to the child's health or safety"].)

In my view, the contrary case law does not present a persuasive alternative account. Given the statutory analysis summarized above, there would appear to be two principal ways one might attempt to defend the conclusion that the extended family inquiry duty under section 224.2(b) is not limited to warrantless removals: (1) One could argue that children removed pursuant to protective custody warrants are placed into temporary custody under section 306, or (2) one could argue that the conditional language in section 224.2(b) is not a limitation at all, so the extended family inquiry duty created by section 224.2(b) applies universally. *Delila D.* takes both approaches. (*Delila D.*, *supra*, 93 Cal.App.5th at pp. 971-972, 974.) All of the cases following *Delila D.* adopt one or the other, but they all fail to address problems with both approaches that were described in *Andres R.*

Two cases agree with *Delila D.*'s claim that a child taken into protective custody pursuant to a protective custody warrant is placed into temporary custody pursuant to section 306, so the extended family inquiry duty under section 224.2(b) applies to such children. (*Delila D.*, *supra*, 93 Cal.App.5th at pp. 971-972; *Jerry R.*, *supra*, 95 Cal.App.5th at pp. 414-417; *C.L.*, *supra*, 96 Cal.App.5th at p. 386.) But the cases do not

4

acknowledge a central problem with their position: Sometimes a child is not taken from parental custody at all until the child is detained by court order at the detention hearing or removed by court order at the disposition hearing. No one has argued (or could credibly argue) that such children are placed into temporary custody under section 306. Thus, even if section 306 applies to removals pursuant to protective custody warrants in addition to warrantless removals, the extended family inquiry duty still would not be universal—*it would not apply to children who were not removed before the detention hearing*. That problem was identified in *Andres R.*, *supra*, 94 Cal.App.5th at p. 857, fn. 9, but none of the cases following *Delila D.* mentions it. As a result, the cases also never explain why the Legislature would create one duty of inquiry for children removed before the detention hearing and a different duty of inquiry for children who are first removed at the detention hearing or later. I am aware of no rationale for such differential treatment. In contrast, the differential treatment under *Robert F.*, *Ja.O.*, and *Andres R.* is easily explained: The Legislature created an extended family inquiry duty for warrantless removals because that is what the BIA guidelines recommend, and the recommendation makes sense because (among other reasons) warrantless removals are often the result of parental absence.

There is an additional problem with the claim that a child taken into protective custody pursuant to a protective custody warrant is placed into temporary custody pursuant to section 306. The cases making that claim assume that protective custody warrants are executed by peace officers, and the cases infer that subdivision (a)(1) of

5

section 306—which concerns children delivered to social workers by peace officers—applies. But protective custody warrants are not always executed by peace officers. Rather, sometimes protective custody warrants are executed directly by social workers, with no peace officer involved. For example, when a baby tests positive for illicit substances at birth, the social worker might serve the protective custody warrant at the hospital with no assistance from law enforcement. And even when peace officers are involved, they do not necessarily take the children into custody themselves and then deliver them to the social worker; rather, the peace officers might be present merely as a show of force to support the social worker, who serves the warrant and takes delivery of the children directly from the parents. If a child is not delivered to a social worker by a peace officer but rather is taken into custody directly by the social worker (with or without law enforcement assistance) pursuant to a protective custody warrant, then there is not even an arguable basis to claim that the child was placed into temporary custody under section 306. Section 224.2(b) therefore would not apply to such children, even if *Delila D.*'s interpretation of subdivision (a)(1) of section 306 were correct. Again, *Delila D.* and cases following it do not explain why the Legislature would create one duty of inquiry for children removed by peace officers pursuant to warrants and a different duty of inquiry for children removed by social workers pursuant to warrants. And again, I am not aware of any rationale for such differential treatment.

Two cases agree with *Delila D.*'s argument that because section 224.2(b) begins with the word "if" instead of the words "only if," the statute's conditional language does

6

not function as a limitation at all, so the duty created by section 224.2(b) applies even to children who were not placed into temporary custody under section 306 or 307. (*Delila D.*, *supra*, 93 Cal.App.5th 974; *V.C.*, *supra*, 95 Cal.App.5th at pp. 259-260; *L.B.*, *supra*, 2023 Cal.App. Lexis 1006 at p. *5.) The argument was assessed and found meritless in *Andres R.*, *supra*, 94 Cal.App.5th at pp. 846-847, but the cases never mention, let alone rebut, *Andres R.*'s analysis. In brief: The extended family inquiry duty was created and imposed by section 224.2(b). No one argues (or could credibly argue) that without section 224.2(b) there would still be a blanket duty to conduct ICWA inquiry of all available extended family members in every case. The conditional language in section 224.2(b), which identifies the circumstances triggering that duty, is the same as the conditional language used in other statutes to identify the circumstances triggering other ICWA-related duties. The duty of "further inquiry" is triggered "[i]f the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding." (§ 224.2, subd. (e).) The duty to provide notice to the tribes is triggered "[i]f the court, a social worker, or probation officer knows or has reason to know . . . that an Indian child is involved." (§ 224.3, subd. (a).) Neither of those provisions says "only if"—they say that the duties arise "[i]f" the relevant circumstances are present. But the provisions cannot be reasonably interpreted as imposing a duty of further inquiry even if there is *not* reason to believe an Indian child is involved, or a duty to provide notice to the tribes even if there is *not* reason to know an Indian child is involved. The identical language in section 224.2(b) must be interpreted the same way.

7

It cannot be reasonably interpreted as imposing a duty to inquire of extended family even if the child was *not* placed into temporary custody under section 306 or 307. (*Andres R.*, *supra*, 94 Cal.App.5th at pp. 846-847.) Again, not one of the cases following *Delila D.* addresses any of that analysis.

The cases' treatment of other issues is no more convincing. Two cases endorse *Delila D.*'s claim that "it simply doesn't make sense to apply different initial inquiries depending on how the child was initially removed from home." (*Delila D.*, *supra*, 93 Cal.App.5th at p. 975; *V.C.*, *supra*, 95 Cal.App.5th at p. 260; *L.B.*, *supra*, 2023 Cal.App. Lexis 1006 at p. *5.) But neither of those cases ever mentions the BIA guidelines, which were cited by *Robert F.*, *Ja.O.*, and *Andres R.* as explaining why creating an extended family inquiry duty for warrantless removals does make sense. (*Andres R.*, *supra*, 94 Cal.App.5th at pp. 849-851; *Ja.O.*, *supra*, 91 Cal.App.5th at pp. 680-681; *Robert F.*, *supra*, 90 Cal.App.5th at pp. 502-503.)

*Jerry R.* likewise never addresses the BIA guidelines. And *Delila D.*'s response concerning the BIA guidelines consists of the puzzling assertion that *Robert F.*'s "argument misconstrues the definition of an emergency removal under both the federal regulations and California law." (*Delila D.*, *supra*, 93 Cal.App.5th at p. 973.) There is no definition of emergency removal in the federal regulations, and California law of course cannot tell us what the BIA guidelines mean by "emergency removal." (*Andres R.*, *supra*, 94 Cal.App.5th at pp. 850-851.) The BIA guidelines, in contrast, do tell us that

8

emergency removals are removals "without court authorization," i.e., warrantless removals. (BIA guidelines, pp. 23-24.)

C.L. contains an extended discussion of federal law, ultimately concluding that "a removal under section 340 [i.e., a removal pursuant to a protective custody warrant] constitutes an emergency *proceeding* under the ICWA *regulations*." (*C.L.*, *supra*, 96 Cal.App.5th at pp. 388-390, italics added.) Whatever the merits of that conclusion and the analysis on which it is based, it is nonresponsive to the simple point made in *Robert F.*, *Ja.O.*, and *Andres R.*: The BIA *guidelines* recommend extended family inquiry for emergency *removals* (not emergency *proceedings*, which are something else), and the BIA guidelines define emergency removals as removals without court authorization, i.e., warrantless removals. (BIA guidelines, pp. 23-24, 28; *Andres R.*, *supra*, 94 Cal.App.5th at pp. 849-851; *Ja.O.*, *supra*, 91 Cal.App.5th at pp. 680-681; *Robert F.*, *supra*, 90 Cal.App.5th at pp. 502-503.) That recommendation explains the Legislature's decision to create a duty of extended family inquiry for warrantless removals.[3]

---

[3] In addition, *C.L.*'s conclusion that "a removal under section 340 constitutes an emergency proceeding under the ICWA regulations" (*C.L.*, *supra*, 96 Cal.App.5th at pp. 388-390) cannot be correct. The regulations define an emergency proceeding as "any court action that involves an emergency removal or emergency placement of an Indian child." (25 C.F.R. § 23.2 (2023).) Although the issuance of a protective custody warrant under section 340 might be described as a court action, a removal pursuant to such a warrant is not a court action—it is something done in the field by a social worker or a law enforcement officer executing the warrant. Similarly, although the issuance of an arrest warrant might be described as a court action, an arrest pursuant to such a warrant is not a court action—it is something done in the field by a law enforcement officer executing the warrant. Because a removal under section 340 is not a court action, it cannot be an emergency proceeding under the ICWA regulations.

Finally, both *Delila D.* and the cases following it appear to be based on the belief that a blanket duty to inquire of all available extended family members in every case is important for effective ICWA enforcement, so limiting that duty to warrantless removals "would significantly undermine the purpose of ICWA." (*Delila D.*, *supra*, 93 Cal.App.5th at p. 976; see *Jerry R.*, *supra*, 95 Cal.App.5th at p. 426 [the *Robert F.* rule "subverts legislative intent and policy goals underlying California dependency law and ICWA"]; *L.B.*, *supra*, 2023 Cal.App. Lexis 1006 at p. *6 [the *Robert F.* rule "'frustrates the purpose of the initial inquiry'"].) In my view, that belief is radically mistaken.

ICWA's protections apply only to children who are Indian children within the meaning of ICWA. (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1009 (*Ezequiel G.*).) To be an Indian child within the meaning of ICWA, a child must be either (1) a member of a federally recognized tribe or (2) eligible for membership and the biological child of a member. (25 U.S.C. § 1903(4).) As *Ezequiel G.* explains, tribal membership "'is voluntary and typically requires *an affirmative act* by the enrollee or her parent.'" (*Ezequiel G.*, at p. 1009.) Thus, because being an Indian child requires that either the child or a biological parent be a tribe member, and because tribal membership is voluntary and typically requires an affirmative act, *it is typically impossible for a child to be an Indian child without the parents knowing about it.* As a result, if both of a child's biological parents are available and deny Indian ancestry, then extended family inquiry is all but guaranteed to be pointless. Such inquiry may uncover some claim of Indian *ancestry*, but it typically cannot reveal that the child is an *Indian child* within the meaning

10

of ICWA unless the biological parents are deliberately concealing the information (despite having every incentive to reveal it). For these reasons, a requirement to conduct ICWA inquiry of all available extended family members in every case—even when the biological parents are available and deny Indian ancestry—would appear to be of negligible importance for effective ICWA enforcement.

In addition to those theoretical considerations, I am not aware of any empirical evidence that such a requirement has been of any benefit to any tribe, any Indian family or child, or anyone else. Anecdotally, my own conversations with dependency court judges have yielded the results one would expect: Extended family inquiry sometimes leads to the discovery of some claim of Indian ancestry, but it has never led to the discovery of an Indian child within the meaning of ICWA when both parents denied Indian ancestry. To my knowledge, attempts to gather data in a systematic manner statewide have produced similar findings.

On the other side of the ledger, the judiciary's mistaken assumption that there is a universal requirement of extended family inquiry has created considerable extra work for already overburdened social workers and juvenile court judges. And that extra work has inevitably created increased opportunities for error, causing widespread disruption in dependency litigation and delaying permanency for hundreds of dependent children. I do not mean to suggest that those costs, though surely nontrivial, are so high that they could not possibly be justified by countervailing benefits. Rather, the point is that requiring

11

ICWA inquiry of all available extended family members in every case is far from costless but in all likelihood produces no benefits.

The foregoing considerations suggest that what "simply doesn't make sense" (*Delila D.*, *supra*, 93 Cal.App.5th at p. 975) is that the Legislature would impose a requirement that appears to be all cost and no benefit in the first place. Fortunately, as *Robert F.*, *Ja.O.*, and *Andres R.* explain, the statutory language shows that the Legislature did no such thing. Instead, it did something far more reasonable. It required extended family member inquiry only in the subclass of cases in which the children were initially taken from parental custody without court authorization, just as the BIA guidelines recommend. The BIA's recommendation and the Legislature's decision to follow it make sense, because extended family member inquiry is important if the parents are not available, and parental absence is one of the criteria for warrantless removal under both the BIA guidelines and California law.

Finally, I wish to emphasize that the importance of scrupulous compliance with ICWA cannot be overstated. ICWA is antigenocide legislation, and to my knowledge it is the most significant federal legislative victory for Indian rights in the history of the United States. (See *Haaland v. Brackeen* (2023) 599 U.S. __ [143 S.Ct. 1609, 1641] (conc. opn. of Gorsuch, J.) [ICWA was a response to federal, state, and private attacks on the Indian family that "presented an existential threat to the continued vitality of Tribes"].) Rigorous enforcement of ICWA is therefore not only legally but also morally imperative.

But more ICWA *inquiry* does not always mean more or better ICWA *enforcement*. If in the future the Legislature decides that the negligible benefits of a universal duty of extended family inquiry are worth the nontrivial costs, and the Legislature enacts such a duty—perhaps by deleting or revising the conditional language in section 224.2(b)—then that legislative command must be rigorously enforced, just like every other part of ICWA and related California law.  But as far as I can determine from the statutory language and the authorities and analysis adduced to date, no such legislative command currently exists.

For all of the foregoing reasons, I continue to believe that the duty to inquire of extended family members under section 224.2(b) is triggered only if the children were taken into temporary custody without a warrant, which did not occur in this case. Accordingly, I believe that the order terminating parental rights should be affirmed, and I respectfully dissent.

MENETREZ          <br/>J.